**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD V. SWENSON AND LORI J. SWENSON, JT TEN, Derivatively on Behalf of Nominal Defendant MICROVAST HOLDINGS, INC., | Case No. _____ |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| YANG WU, CRAIG WEBSTER, SASHA KELTERBORN, SHANE SMITH, ZACHARIAH WARD, YEELONG TAN BALLADON, STEPHEN VOGEL, WEI YING, STANLEY WHITTINGHAM, ARTHUR WONG, and YANZHUAN ZHENG, | |
| Defendants, | |
| and | |
| MICROVAST HOLDINGS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiffs Richard V. Swenson and Lori J. Swenson, JT Ten ("Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant Microvast Holdings, Inc. ("Microvast" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' publicly

available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Microvast, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Schelling v. Microvast Holdings, Inc.. et al.*, Case No. 4:23-cv-04565 (S.D. Tex.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiffs on behalf of Microvast against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least October 19, 2022, and April 1, 2024, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.    Founded in 2006, Microvast is an advanced battery technology company that specializes in the design, development, and manufacturing of battery component systems and systems primarily for electric commercial vehicles and utility-scale energy storage systems ("ESS").

3.    The Company was formed as a result of a merger that closed on July 28, 2021 (the "Merger") between Tuscan Holdings Corp. ("Tuscan") and Microvast, then a private company operating as a lithium-ion battery startup. Upon completion of the Merger, the Company took on the operations of Microvast's business as its own.

---

[1] The Individual Defendants are Yang Wu ("Wu"), Craig Webster ("Webster"), Sasha Kelterborn ("Kelterborn"), Shane Smith ("Smith"), Zachariah Ward ("Ward"), Yeelong Tan Balladon ("Balladon"), Stephen Vogel ("Vogel"), Wei Ying ("Ying"), Stanley Whitingham ("Whittingham"), Arthur Wong ("Wong"), and Yanzhuan Zheng ("Zheng"). "Defendants" means Microvast and the Individual Defendants.

4.      The Company conducts substantially all of its business through its Chinese subsidiary. Specifically, Microvast develops its intellectual property in China, manufactures its batteries for commercial electric vehicles in China, and makes the majority of its sales to companies located in China. Indeed, as of March 2021, almost 95% of the Company's employees were based in China.

5.      In 2021 and 2022, the U.S. Congress passed two laws creating subsidy programs to support a nascent U.S. green energy industry: (i) the Bipartisan Infrastructure Law; and (ii) the Inflation Reduction Act. In administering these laws, the U.S. government repeatedly stated that they were focused on supporting American companies to help the U.S. reduce its reliance on Chinese suppliers in the green energy industry.

6.      Then, in May 2022, the Department of Energy ("DOE") announced that it would award $3 billion in grants, which would be allocated by the Bipartisan Infrastructure Law, to help U.S. battery companies develop their U.S. operations.

7.      Thereafter, by letter of intent, in May 2022, and formally in July 2022, the Company applied for a $200 million grant from the DOE (the "Application"). However, the Application was not publicly released at the time.

8.      In its Application, Microvast emphasized its connection to the United States in order to secure funding while failing to disclose that: (i) substantially all of the Company's operations were conducted in China; (ii) the vast majority of the Company's employees were based in China; and (iii) Microvast maintained extensive ties with the Chinese government.

9.      Meanwhile, Microvast announced plans to construct a battery manufacturing facility in Clarksville, Tennessee (the "Clarksville Facility") to further exploit Inflation Reduction Act subsidies. Specifically, the Company expected to receive subsidies for every battery produced

at the Clarksville Facility, amounting to roughly 25% of the sale price.

10.    Throughout the Relevant Period, Microvast's management touted the Company's progress in its construction of the Clarksville Facility in connection with its scheme to overstate Microvast's ties to the United States. In reality, progress at the Clarksville Facility was severely behind schedule after construction delays, equipment procurement failures, and a work stoppage after key contractors began to abandon the project due to Microvast's failure to pay its bills.

11.    Additionally, Microvast's management repeatedly represented that the Company had received the DOE grant when, in reality, the DOE had merely invited Microvast to negotiate for a grant.

12.    On May 22, 2023, the truth with respect to the Company's DOE Application emerged when Bloomberg reported that the DOE was discontinuing negotiations over the $200 million grant.

13.    On this news, the price of Microvast stock declined 45.2%, from a price of $2.20 per share on May 22, 2023 to a price of $1.40 per share on May 23, 2023.

14.    Then, on April 1, 2024, the Company revealed that it had stopped construction of the Clarksville Facility until it could secure necessary financing.

15.    On this news, the price of Microvast stock declined 34.1%, from a close of $0.90 per share on April 1, 2024 to a close of $0.59 per share on April 2, 2024.

16.    As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Wu and Webster in the United States District Court for the Southern District of Texas.

17.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying

class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") as the claims asserted herein arise under Sections 10(b), 21D, and 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

19. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22. In connection with the acts, conduct, and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Microvast maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiffs*

24.    Plaintiffs are, and have been at all relevant times, continuous shareholders of Microvast common stock.

*Nominal Defendant*

25.    Nominal Defendant Microvast is a Delaware corporation with its principal executive offices located at 12603 Southwest Freeway, Suite 300, Stafford, Texas 77477. Microvast's common stock trades on the NASDAQ under the ticker symbol "MVST."

*Individual Defendants*

26.    Defendant Wu is the founder of the Company and has served as Chief Executive Officer ("CEO") and Chairman of the Board of the Company since October 2006. Defendant Wu previously served as President of the Company at various times. Defendant Wu is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Wu received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $982,892 |
| 2023 | $649,008 |
| 2024 | $1,154,480 |

27.    Defendant Webster served as CFO of the Company from April 2022 until April 2024. Webster previously served as a director of the Company from July 2021 until July 2022. Defendant Webster is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Webster received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $3,673,231 |
| 2023 | $727,750 |

28.     Defendant Kelterborn served as the Company's Chief Revenue Officer from July 2021 until April 2024. Defendant Kelterborn additionally served as the Company's President from April 2022 until January 2023. Defendant Kelterborn initially joined the Company in January 2017 as Deputy Managing Director of Microvast GmbH. Defendant Kelterborn is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Kelterborn received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $3,165,418 |

29.     Defendant Smith served as the Company's Chief Operating Officer from July 2021 until August 7, 2023, before serving as its Chief Procurement Officer until his resignation two weeks later. Defendant Smith is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Smith received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $1,648,356 |

30.     Defendant Ward served as the Company's Senior Vice President from January 2022 until August 2022, and as its President from August 2022 until his resignation in February 2024. Defendant Ward is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Ward received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $2,143,083 |

31.     Defendant Balladon served as a director of the Company from July 2022 until July 2024. According to the Company's public filings, Defendant Balladon received the following in

compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $122,500 |
| 2023 | $199,129 |
| 2024 | $75,317 |

32.    Defendant Vogel served as a director of the Company from July 2021 until July 2024. Vogel previously served as Chairman and CEO of Tuscan. According to the Company's public filings, Defendant Vogel received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $160,000 |
| 2023 | $194,129 |
| 2024 | $46,712 |

33.    Defendant Ying has served as a director of the Company since 2021. According to the Company's public filings, Defendant Ying received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $149,999 |
| 2023 | $184,129 |
| 2024 | $79,999 |

34.    Defendant Whittingham served as a director of the Company from July 2021 until October 2023. According to the Company's public filings, Defendant Whittingham received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $115,000 |
| 2023 | $166,129 |

35.    Defendant Wong has served as a director of the Company since July 2021. According to the Company's public filings, Defendant Wong received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $161,000 |
| 2023 | $204,129 |
| 2024 | $99,999 |

36.     Defendant Zheng served as a director of the Company from July 2021 until August 2024. Zheng also served as CFO of the Company from July 2021 until April 2022, and as an advisor to the Company since April 2022. According to the Company's public filings, Defendant Zheng received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $309,214 |
| 2023 | $297,014 |
| 2024 | $226,983 |

***Non-Party Confidential Witnesses***

37.     This action is based on Plaintiffs' review, by counsel, of an extensive record public documents as well as the Amended Class Action Complaint (the "Amended Complaint") filed in the Securities Class Action, which contains detailed allegations based on interviews with three former Microvast employees (referred to herein as "FEs 1-3") who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

38.     FE 1 worked at the Clarksville Facility as a Maintenance Supervisor from March 2023 until December 2023. In this role, FE 1 was responsible for the maintenance and repair of equipment at the Clarksville Facility. However, due to delays in the arrival of equipment to the Clarksville Facility, FE 1 was primarily responsible for conducting basic construction tasks. Until August 2023, FE 1 reported to FE 3. From August 2023 until December 2023, FE 1 reported to Christopher Barbee, who, in turn, reported to William Muir ("Muir"), the Company's Vice

President – North American Manufacturing and Director of the Clarksville Facility. Muir reported to Defendant Smith.

39.     FE 2 worked at Microvast as a Buyer for the Clarksville Facility from May 2023 until August 2023. In this role, FE 2 was primarily responsible for purchasing services for the Clarksville Facility. FE 2 reported to Joe Muraca, who, in turn, reported to David Lankewicz, the Company's VP of Global Supply Chain. After August 2023, FE 2 worked as a Buyer and a Systems, Application, and Products Analyst at the Company's Colorado Facility. During FE 2's time with the Company, FE 2 communicated with vendors regarding the Company's overdue bills.

40.     FE 3 worked at Microvast as a Maintenance Manager at the Clarksville Facility. In this role, FE 3 was primarily responsible for oversight over the installation, testing, and operation of equipment at the Clarksville Facility. FE 3 reported to Muir, who, in turn, reported to Defendant Smith.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers and/or directors of Microvast, and because of their ability to control the business and corporate affairs of Microvast, the Individual Defendants owed Microvast and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Microvast in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Microvast and its shareholders.

42.     Each director and officer of the Company owes to Microvast and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Microvast, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the officers and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Microvast, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

46.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's

common stock would be based upon truthful, accurate, and fairly presented information.

47.    To discharge their duties, the officers and directors of Microvast were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Microvast were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas and the United States, and pursuant to Microvast's own Code of Ethics;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how Microvast conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Microvast and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Microvast's operations would comply with all applicable laws and Microvast's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to Microvast and the shareholders the duty of loyalty requiring that each favor Microvast's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Microvast and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, and directorial positions with Microvast, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microvast.

## MICROVAST'S CODE OF ETHICS

52.    The Company's Code of Ethics states that it applies to the Company's "directors, officers, and employees," and that it "sets forth requirements for honest and ethical conduct,

ensures compliance with applicable governmental laws, rules and regulations and provides accountability for adherence to this Code."

53.     Under a section titled "Conflicts of Interest," Microvast's Code of Ethics states:

A conflict of interest is a situation where a Covered Person's personal or professional interests (or those of an immediate family member or other close relative or friend or any other person who may act on such Covered Person's behalf) can affect his or her ability to act in the Company's best interests or interfere (or appear to interfere) with his or her personal objectivity and obligations to the Company. All Covered Persons should engage in honest and ethical conduct, including avoiding any actual or apparent conflicts of interest. All Covered persons are charged with acting in the Company's best interests at all times. Employees and officers may not hold outside employment that interferes with their job performance at the Company. Officers and directors should also refer to the Company's Related Party Transactions Policy for additional information. Consistent with the rules of the Nasdaq Stock Market ("Nasdaq") and Section XIV below, any waiver of this conflict of interest policy for a director or executive officer of Microvast Holdings may only be made by the Board of Directors of Microvast Holdings (the "Board"), and any such waiver should be promptly disclosed to the stockholders of Microvast Holdings.

All Covered Persons are obligated to continually evaluate their personal and employment situations and promptly report to the Compliance Officer any material transaction or relationship that could be expected to give rise to an actual or apparent conflict of interest.

If you become aware of a business or financial opportunity as part of your work with the Company, you are not permitted to use any such information or usurp that opportunity for your own personal gain. You may not use Company property or information or your position with the Company for personal gain and should not compete with the Company or any of its affiliates directly or indirectly.

54.     Under the section titled "Record-Keeping," the Code of Ethics states:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions, and it documents and records business expenses accurately. Questionable expenses should be discussed with the appropriate personnel in the Company's accounting department. All of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect its transactions and conform both to applicable legal requirements and to the Company's system of internal controls.

The Company avoids exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies in its business records and

communications. The Company maintains its records according to its record retention policies. In accordance with those policies, in the event of any litigation or governmental investigation concerning the Company's records or communications, please consult with the Compliance Officer if you have any questions.

55.    Under the section titled "Public Reporting," the Code of Ethics states:

Microvast Holdings is a public company and, as a result, files reports and other documents with the United States Securities and Exchange Commission (the "SEC") and Nasdaq, on which its common stock trades. In addition, Microvast Holdings issues press releases and makes other public statements in accordance with its Corporate Disclosure Policy that include financial and other information about the Company's business, financial condition and results of operations. Microvast Holdings endeavors to make full, fair, accurate, timely and understandable disclosures in reports and documents it files with, or submits to, the SEC and in its press releases and public communications.

The Company requires cooperation and open communication with its auditors. It is illegal to take any action to fraudulently influence, coerce, manipulate or mislead any auditor engaged in the performance of an audit of the Company's financial statements.

The laws and regulations applicable to filings made with the SEC, including those applicable to accounting matters, are complex. While the ultimate responsibility for the information included in these filings rests with Company management, numerous other employees participate in the preparation of these filings or provide information included in these filings. The Company maintains disclosure controls and procedures to ensure that the information included in these filings is collected and communicated to Company management in order to permit timely disclosure of such information.

If you are requested to provide, review or certify information in connection with the preparation of a filing to be made with the SEC, you must provide the requested information in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report any significant information that you believe should be considered for disclosure in Microvast Holdings' filings with the SEC. If you have questions or are uncertain as to how the Company's disclosure controls and procedures may apply in a specific circumstance, promptly contact your supervisor or the Compliance Officer. Additional information regarding how to report your questions or concerns (including on a confidential, anonymous basis) is included in Section XIII below.

56.    Under the section tilted "Compliance with Laws, Rules and Regulations," the Code

of Ethics states:

The Company is obligated to comply with all applicable laws, rules and regulations, including with respect to human rights, forced labor, child labor, human trafficking, bribery, discrimination, harassment and pay equity. The Company strives to conduct its business ethically and in a way that demonstrates respect for globally recognized human rights and the dignity of all people. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company. Company management is also required to promote compliance with the Code by all employees and to abide by Company standards, policies and procedures.

## MICROVAST'S AUDIT COMMITTEE CHARTER

57.    Microvast's Audit Committee Charter states that the purposes of the Audit

Committee are to:

- oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;

- take, or recommend that the Board take, appropriate action to oversee (1) the qualifications, independence and performance of the Company's independent auditors, and (2) the performance of the Company's internal audit function;

- prepare the report required by the rules of the United States Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;

- review any proposed related party transactions and approve, ratify or disallow each such proposed transaction;

- review any proposed pre-arranged trading plans to be entered into by Covered Persons (as defined in the Insider Trading Policy) pursuant to SEC rule 10b5-1(c) and approve, ratify or disallow each such proposed trading plan;

- approve reimbursement of expenses incurred by Company management in identifying potential target businesses; and

- oversee and review the Company's guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

58.    In a section titled "Responsibilities and Authority," the Audit Committee Charter

states that the Audit Committee has the following responsibilities, among others:

**B.    Annual Performance Evaluation of the Committee**

- At least annually, the Committee shall evaluate its own performance and report the results of such evaluation to the Board and the Nominating and Corporate Governance Committee. The Committee shall conduct this evaluation in such manner as it deems appropriate.

**C.    Matters Relating to Selection, Performance and Independence of Independent Auditors**

- The Committee shall be directly responsible for the appointment, retention and termination, and for determining the compensation, of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Company shall provide appropriate funding for payment of such compensation. The Committee shall exercise this authority in a manner consistent with Sections 201, 202 and 301 of the Sarbanes-Oxley Act of 2002 and the rules and listing requirements promulgated thereunder by the SEC and Nasdaq.

- The Committee shall be directly responsible for overseeing the work of the independent auditors (including resolution of disagreements between Company management and the independent auditors regarding financial reporting) engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services for the Company. . . .

**D.    Audited Financial Statements and Annual Audit**

- The Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of Company management who are responsible for preparing the Company's financial statements, including the Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executives").

- The Committee shall review and discuss with Company management (including the Senior Accounting Executives) and with the independent auditors the Company's annual and quarterly audited financial statements, including (a) all critical accounting policies, practices and controls used or to be used by the Company and any other matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder by the SEC, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K and

17

(c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Committee shall review:

    (i)     any analyses prepared by Company management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements and the treatment preferred by the independent auditors. The Committee may also consider other material written communications between the independent auditors and Company management, such as any management letter or schedule of unadjusted differences;

    (ii)    major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, as well as the Company's disclosures regarding internal controls;

    (iii)   major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

    (iv)    the effects of regulatory and accounting initiatives, as well as off- balance sheet transactions and structures, on the financial statements of the Company.

- The Committee shall review and discuss with the independent auditors any audit problems or difficulties and Company management's response thereto. This review shall include (1) any difficulties encountered by the independent auditors in the course of performing their audit work, including any restrictions on the scope of their activities or their access to information, (2) any significant disagreements with Company management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function.

- This review may also include:

- At least annually, and prior to the filing of the Company's Annual Report on Form 10-K, the Committee shall discuss with the independent auditors the matters required to be discussed by PCAOB Auditing Standard 1301 ("AS 1301") and other generally accepted accounting standards relating to the conduct of the audit, as well as any audit problems or difficulties and Company management's response, including (1) any restriction on audit scope or on access to requested information, (2) any disagreements with Company management and (3) significant issues discussed with the independent auditors' national office. The Committee shall decide all

unresolved disagreements between Company management and the independent auditors regarding financial reporting.

- The Committee shall obtain assurances from the independent auditors that in the course of conducting the audit, there have been no acts detected or that have otherwise come to the attention of the audit firm that require disclosure to the Committee under Section 10A(b) of the Exchange Act.

- The Committee shall review and discuss with the independent auditors the report required to be delivered by the independent auditors pursuant to Section 10A(k) of the Exchange Act.

- The Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving Company management or other employees who have a significant role in the Company's internal control over financial reporting.

- The Committee shall review and discuss with Company management any recommendations made by the independent auditors, as well as such other matters, if any, as such persons or other officers of the Company may desire to bring to the attention of the Committee.

- Based on the Committee's review and discussions (1) with Company management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by AS 1301 and (3) with the independent auditors concerning the independent auditors' independence, the Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- The Committee shall prepare or oversee the Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

**E.     Unaudited Quarterly Financial Statements**

- The Committee shall discuss with Company management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and

Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100 and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

**F.      Earnings Press Release**

- The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

**G.      Risk Assessment and Management**

- The Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by Company management.

- In connection with the Committee's discussion of the Company's risk assessment and management guidelines, the Committee may discuss or consider the Company's major financial and accounting risk exposures or other exposures and the steps that Company management has taken to monitor and control such exposures.

- The Committee shall periodically meet with the Compliance Officer to review and discuss any reports of wrongdoing or inappropriate conduct received directly by the Compliance Officer or through the Company's Whistleblower Hotline and any risk exposures in connection therewith. . . .

**I.      Regular Reports to the Board**

- The Committee shall periodically obtain reports from Company management and the independent auditors that the Company and its subsidiaries/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Ethics.

- The Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Committee deems appropriate or is requested to review for the benefit of the Board.

59.     Under the section titled "Additional Authority," the Audit Committee

Charter states, in relevant part:

> The Committee is authorized, on behalf of the Board, to do any of the following as
> it deems necessary or appropriate:

**A.     Engagement of Advisors**

- The Committee may engage independent counsel and such other advisors
  as it reasonably deems necessary or advisable to carry out its responsibilities
  and powers, and, if such counsel or other advisors are engaged, shall
  determine the compensation or fees payable to such counsel or other
  advisors. The Company shall provide reasonable and appropriate funding
  for payment of such compensation or fees.

**B.     Legal and Regulatory Compliance**

- The Committee shall discuss with Company management or outside legal
  counsel and the independent auditors and review with the Board the legal
  and regulatory requirements applicable to the Company and its subsidiaries
  and the Company's compliance with such requirements. After these
  discussions, the Committee may, if it determines it to be appropriate, make
  recommendations to the Board with respect to the Company's policies and
  procedures regarding compliance with applicable laws and regulations.

- The Committee shall discuss with Company management any legal matters
  (including pending or threatened litigation) that may have a material effect
  on the Company's financial statements or its compliance policies and
  procedures.

**C.     Conflicts of Interest**

- The Committee shall conduct an appropriate review of all related party
  transactions of the Company that are required to be disclosed pursuant to
  Item 404 of Regulation S-K promulgated by the SEC for potential conflict
  of interest situations on an ongoing basis and review proposed related party
  transactions requiring approval or ratification under the Company's Related
  Party Transactions Policy. The Committee may establish such policies and
  procedures as it reasonably deems appropriate to facilitate such review.

## SUBSTANTIVE ALLEGATIONS

*Background*

60.     Microvast is incorporated under the laws of Delaware and maintains its principal

executive offices in Stafford, Texas. The Company is the result of the Merger that closed on July 28, 2021 between Tuscan and Microvast, then a private company operating as a lithium-ion battery startup. Upon completion of the Merger, the Company took on the operations of Microvast's business as its own.

61.     Certain directors and/or officers of Tuscan, however, had conflicts of interest in connection with the Merger stemming from their ownership of "Founder Shares." These Founder Shares had been acquired by Tuscan insiders for less than $0.01 per share – significantly below the $10 per share that public stockholders paid in the Company's initial public offering (the "IPO").

62.     Further, these individuals acquired private placement units in Tuscan that had no liquidation rights and would be essentially worthless except in the context of a completed business combination. Defendant Vogel owned the bulk of the Founder Shares and had to complete a merger for Tuscan before securing a merger partner for his next SPAC, Tuscan Holdings Corp. II ("Tuscan II").

63.     These conflicts of interest led to self-interested conduct. For instance, in late 2021, as Tuscan's initial transaction window was closing, Defendant Vogel changed Tuscan's focus from targets in the legal cannabis industry to Legacy Microvast.

64.     At the time Merger discussions began, Legacy Microvast was facing a liquidity crisis, and needed Tuscan's cash to prevent the Company from defaulting on its debt obligations.

65.     As alleged in the amended complaint filed in a shareholder class action lawsuit captioned *Matt Jacob v. Stephen A. Vogel, et al.*, C.A. No. 2022-0600-PAF (Del. Ch.) (the "Delaware Class Action"), Legacy Microvast had significant liabilities that were payable within the following year. One such payment was due in November 2020 for a debt owed to CITIC Securities Ltd. ("CITIC"), an investment bank that was majority-owned by the Ministry of Finance

of the People's Republic of China (the "PRC").

66.    Defendants Wu and Zheng developed a plan to use the forthcoming cash from a transaction with Tuscan to leverage an extension of the CITIC payment to March 2021, by which time a business combination agreement could be approved and executed, and a short-term loan could then be secured to pay the amount owed.

67.    Additionally, without consulting Tuscan's board and before conducting due diligence, on September 24, 2020, Defendant Vogel signed an exclusivity letter with Legacy Microvast on behalf of Tuscan which attached the final term sheet that ascribed a "pre-transaction equity value" for Legacy Microvast of $2.1 billion.

68.    According to the Delaware Class Action, by the time Defendant Vogel approved the exclusivity letter and term sheet, the Tuscan board still had not held a single meeting to discuss Microvast. Defendant Vogel was then permitted to run the Merger process with no meaningful oversight, notwithstanding his significant conflicts of interest.

69.    As alleged in the Delaware Class Action, certain directors and officers of Tuscan learned from Tuscan's due diligence advisor that Defendants Wu and Zheng had made patently unsupportable assumptions in their financial model for Microvast, including revenue projections for business lines and contracts that simply did not exist or would be nearly impossible to scale as planned.

70.    However, with time running out to complete the Merger before their Founder Shares became worthless, Tuscan's directors and officers pushed ahead, making no to effort to renegotiate the inflated $2.1 billion valuation, and abandoning their unsuccessful efforts to secure a fairness opinion from a financial advisor for the Merger, as Tuscan's advisors at Morgan Stanley & Co., LLC refused to provide one. The Tuscan board formally approved the Merger on January

29, 2021.

71.      On February 1, 2021, Tuscan and Legacy Microvast jointly announced the Merger through a public press release and an accompanying investor presentation (the "Investor Materials").

72.      Also on February 1, 2021, Tuscan and Microvast held a joint conference call with analysts and investors, led by Defendants Vogel and Wu, to discuss the Merger. During the call, Microvast management emphasized that "we signed a 7-year global cooperation agreement with CNH Industrial and its subsidiary FPT Industrial S.p.A," and "Microvast will be FPT Industrial's exclusive supplier for the New Daily Electric battery solution to be launched in 2022."

73.      FPT Industrial ("FPT") is an Italian multinational designer and manufacturer of alternative engines and propulsions for industrial vehicles. Following the February 1, 2021 call, FPT's Head of Industrial Purchasing wrote to Microvast to express "serious concerns relating to a number of statements in the Investor Materials regarding FPT Industrial S.p.a. and its affiliates."

74.      FPT further demanded that Tuscan and Microvast make numerous retractions and corrections concerning the terms and scope of the contract, including "tak[ing] out all references to revenues" because "we believe that they are factually not correct," as well as removing all references to Microvast being its "exclusive supplier."

75.      On February 5, 2021, Tuscan filed a second investor presentation with the SEC that removed the false information that FPT had identified. But the disclosure did not instruct stockholders to disregard the prior Investor Materials or the transcript of the public conference call, nor explain why an "updated presentation" had been issued.

76.      Though Tuscan stockholders had the right to redeem their shares at the IPO price, plus interest, rather than owning shares of "New Microvast," the Individual Defendants impaired

that right by issuing a false and misleading Definitive Proxy Statement on July 2, 2021 (the "2021 Proxy Statement").

77.    The 2021 Proxy Statement included Microvast's "hockey stick" projections, but did not disclose the impartial, objective information that Tuscan's due diligence advisor had identified.

78.    The 2021 Proxy Statement also included material misstatements regarding Microvast's contractual relationship with FPT, and generally provided a misleading description of the Merger process.

79.    Moreover, the 2021 Proxy Statement failed to disclose Microvast's dismal operating results for the quarter immediately preceding the Merger, and that Defendants Wu and Zheng had already slashed Microvast's near-term forecasts before the stockholder vote.

80.    On July 2, 2021, Tuscan filed the 2021 Proxy Statement with the SEC, in which Tuscan's board solicited Tuscan shareholders' approval of the Merger and in which Legacy Microvast's Board solicited Legacy Microvast shareholders' approval of the Merger.

81.    The 2021 Proxy Statement called for shareholders: to approve, among other things, the Merger and certain amendments to Tuscan's Second Amended and Restated Certificate of Incorporation; to elect seven directors to the post-Merger Board; to vote to approve the issuance of up to an aggregate of 230 million shares of common stock of Tuscan to the shareholders of Legacy Microvast; and to vote and approve the Microvast 2021 Equity Incentive Plan (the "2021 Plan").

82.    The 2021 Proxy Statement further advised that the "merger consideration to be issued to the Microvast stockholders in the Merger consists of a portion of the 210,000,000 shares of Common Stock ('Closing Transaction Consideration') and the Earn-Out Shares, if any, as and

when received."

83.     The 2021 Proxy Statement represented that Legacy Microvast enjoyed a "robust, and probability weighted, pipeline estimated at $4.1 billion through 2025, and signed contracts with a total value of over $1.5 billion through 2027."

84.     In reality, however, as alleged in the amended complaint filed in the Delaware Class Action, Legacy Microvast had internally abandoned these projections weeks earlier.

85.     The 2021 Proxy Statement further represented that Tuscan's board of directors conducted a "thorough review" of the "business combination opportunities reasonably available," and emphasized "the process utilized to evaluate and assess" potential business combination targets, falsely encouraging Tuscan stockholders that such due diligence was undertaken for the goal of "enhancing stockholder value."

86.     Shareholders of both companies approved the Merger, which closed on July 21, 2021. However, unbeknownst to the shareholders approving the Merger, the value of the Merger was not in line with Tuscan's or Legacy Microvast's public representations. In fact, as alleged in the Delaware Class Action, through the Merger, Tuscan inherited a business that was close to non-operative and offered little in the way of financial growth or success.

87.     As alleged in the Delaware Class Action, the individuals serving on the Tuscan board and Legacy Microvast's board deceived stockholders into approving the Merger, and with it, lucrative arrangements that materially benefitted top insiders at Tuscan and Legacy Microvast to the Company's detriment.

88.     The truth with respect to the materially misleading 2021 Proxy Statement was revealed on August 17, 2021, less than three weeks after the Merger was approved, when the Company revealed its second quarter 2021 financial results and issued drastically reduced

guidance for fiscal year 2021.

89.     Specifically, the August 17, 2021 disclosure revealed that, "[b]ased on conditions, trends, and other factors, Microvast is introducing a revenue guidance range for the fiscal year ending December 31, 2021, of $145 million to $155 million."

90.     This significant revision marked a $75 million drop in revenue on the high end of the revised guidance, marking a 33% reduction in annual revenue as compared to the guidance in the 2021 Proxy Statement that was issued slightly over a month earlier.

91.     On this news, the price of the Company's common stock fell by $1.38 per share, or approximately 13%, from its closing price of $10.35 per share on August 16, 2021, to close at $8.97 per share on August 17, 2021.

92.     Shortly thereafter, in September 2021, upon information and belief, the SEC launched an investigation into Tuscan, Microvast, and the Merger.

93.     On March 29, 2022, the Company filed its annual report on Form 10-K (the "2021 10-K") for the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"). The 2021 10-K revealed that Microvast finished the 2021 Fiscal Year with $152 million in revenue with a net loss of $206.5 million, representing a $78 million miss from the financial projections contained in the 22021 Proxy Statement. Additionally, Microvast's operating margin fell to -28.1%, constituting a massive difference from the 5% operating margin the 2021 Proxy Statement indicated the Company would achieve.

94.     Moreover, following the Merger, Microvast made or permitted to be made a series of materially false and misleading statements regarding the Company's business, operations, and prospects to the investing public. Specifically, such statements mischaracterized or failed to fully disclose certain dealings with the DOE as well as the progress and status of a new facility under

development.

95.     In 2021 and 2022, the United States Congress passed two laws creating subsidy programs to support a nascent U.S. green energy industry – the Bipartisan Infrastructure Law and the Inflation Reduction Act. The primary focus of the subsidies was to decrease this country's reliance on foreign sources of batteries, specifically China. In July 2022, Microvast submitted an application for a $200 million grant from the DOE. The Application was not publicly disclosed.

96.     In the Application, Microvast claimed it was a U.S. company operating out of the U.S. with some operations in other countries, including China, and claimed to have manufacturing operations, and to have developed intellectual property, in the U.S. and Europe as well as China. The Application did not describe the Company's China operations as the site of substantially all its operations, instead simply listing China as another of the Company's international offices. Further, the Application failed to disclose Microvast's extensive ties with the Chinese government or that 95% of the Company's employees are based in China.

97.     In October 2022, the DOE chose Microvast to conditionally receive the proposed $200 million grant, intended for funding a proposed polyaramid separator production facility.[2] On October 19, 2022, the Company announced that it had been "***selected as a recipient*** of a $200 million grant."[3]

98.     Investors, who could have reasonably assumed the Company had been forthright in the Application about the Chinese government's potential influence over it, were now also led to believe that the DOE had not only considered such potential influence, but decided to proceed with a grant anyway.

---

[2] A polyaramid separator is an insulating film between the cathode and anode in lithium-ion batteries, and are commonly used in large lithium-ion batteries that power electric vehicles.

[3] Emphasis added unless otherwise indicated.

99.     On May 23, 2023, the truth began to emerge when *Reuters* published an article titled "US will not award $200 mln grant for Microvast battery company." The same day, a spokeswoman for the DOE stated that the DOE "can confirm that it has elected to cancel negotiations and not to award Microvast funds from this competitive funding opportunity."

100.    Meanwhile, the Company was building the Clarksville Facility that would make its state-of-the-art battery. Microvast would receive subsidies from the Inflation Reduction Act for every battery the Clarksville Facility sold amounting to about 25% of the sale price, so that once built, the Clarksville Facility would immediately be profitable.

101.    According to the account of several former Microvast employees, however, by April 2023, progress at the Clarksville Facility was severely behind schedule after construction delays, equipment procurement failures, and a work stoppage after key contractors began to abandon the project due to Microvast's failure to pay its bills.

102.    For example, FE 1 explained that, as of June 2023, the Clarksville Facility lacked electricity and the floors were unfinished. FEs 2 and 3 similarly recalled that, even by August 2023, the facility lacked power, except as to certain functions like HVAC.

103.    Further, the Company manufactures its lithium-ion batteries in areas free of airborne particles, referred to as cleanrooms. FE 3 explained that Microvast failed to begin construction of its cleanrooms until May or June of 2023 and by the time of FE 3's departure in August 2023, the Company has only completed construction of the cleanroom walls.

104.    FE 3 further identified several issues which contributed to the construction delays. For example, in June 2023, the Company discovered that one of its electric substation breakers lacked sufficient amperage. FE 3 explained that acquiring the necessary breaker was expected to delay installation until late 2023.

105.    Making matters worse, the former employees explained that, by August 2023, the Company had stopped paying certain invoices, causing several of the Company's contractors to institute credit holds. FE 2 communicated personally with several vendors who complained about overdue bills.

106.    By December 2023, several of Microvast's contractors working on the Clarksville Facility began to abandon the project, with FE 1 characterizing the state of the facility at that time as "just a shell," lacking several basic functions.

107.    Despite the foregoing, the Company concealed these delays and cost overruns by making false and misleading statements about the existing state of the equipment procurement and of construction.

108.    On April 1, 2024, the Company finally announced that it was suspending work on the Clarksville Facility and that its contractors had filed $31.9 million of mechanics' liens. The Company further admitted that it had completed only 50% of the total $300 million capital expenditures.

***Individual Defendants' Materially False and Misleading Statements Concerning the DOE Application***

109.    On October 19, 2022, Microvast tweeted on its official account:

At 3pm today, the White House will announce that our thermally stable polyaramid separator manufacturing plant proposal ***was selected as a recipient of a $200 million grant*** from the DOE's Battery Materials Processing and Battery Manufacturing initiative.

110.    Also on October 19, 2022, the Company filed a current report on Form 8-K with the SEC repeating the text of the tweet.

111.    On November 2, 2022, Microvast issued a press release announcing that it had received a grant from the Department of Energy:

HOUSTON, Texas, USA, November 2, 2022 — A wholly-owned subsidiary of Microvast Holdings, Inc. (NASDAQ: MVST) ***was selected*** by the U.S. Department of Energy (DOE) in collaboration with General Motors ***to receive a $200 million grant*** as part of the first set of projects funded by President Biden's Bipartisan Infrastructure Law. Over 200 companies applied for $2.8 billion in DOE grant funding and 20 companies were awarded grants.

*         *         *

As part of the selection process for the DOE grant, Microvast has been invited to negotiate the specific terms of the grant funding. ***Once the terms have been finalized***, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed during these negotiations.

112.    On November 10, 2022, the Company hosted an earnings call with analysts and investors to discuss third quarter 2022 results. In a PowerPoint slide included during the presentation, the Company highlighted that it had been "[s]elected by DOE, in collaboration with General Motors, **to receive $200 million grant** under Bipartisan Infrastructure Law in recognition of innovative polyaramid separator technology."[4] Another slide presented the following:



## Selected by the U.S. Department of Energy for a $200 Million Grant

| Polyaramid Separator Funding of DOE |
|---|

- Microvast selected by the U.S. Department of Energy ("DOE") to receive a $200 million grant.
- Over 200 companies applied for $2.8 billion in grant funding; only 20 companies selected.
- The DOE grant, plus funding to be arranged by Microvast, will support construction of a mass production facility in the U.S. for our thermally stable polyaramid separator technology.
- Target markets for polyaramid separator are large and growing and include commercial, specialty and passenger EVs, as well as consumer electronics and ESS systems.
- Microvast holds unique, patented wet-process technology to produce a thin polyaramid base film for very high temperature resistance.
- The separator is a critical element for battery safety and our polyaramid technology has significant safety advantages over incumbent technology such as polyethylene and polypropylene.
- Microvast and General Motors will collaborate to create a specialized separator.

113.    On February 15, 2023, Microvast delivered a presentation at the Baird Vehicle Technology & Mobility Conference, using, among other things, the same presentation slide as

---

[4] Emphasis in original.

above. In presenting the slide, Defendant Kelterborn stated:

> *And now we're bringing [the separator] to the market, thanks to the DOE grant of 200 million, which we just, just, just received.* As I mentioned, selected by the US Department of Energy for a 200 million grant for our separator technology, only 20 companies were selected. We are very proud as an American company to receive that honor and being recognized as one of the very important partners for developing battery technology further into US—and we are happy that General Motors will collaborate with us to create this special live separator.

114.    On March 16, 2023, the Company hosted an earnings call to discuss fourth quarter 2022 results (the "4Q22 Earnings Call"). During the call, Defendant Wu stated, in relevant part: "*We were also selected for $200 million grant by the U.S. Department of Energy to build our most advanced high-temperature separator plant in the United States to help enhance battery safety for the industry*."

115.    Also during the 4Q22 Earnings Call, following an analyst's question concerning the DOE grant, Defendant Wu responded that "*right now it's very close to close the deal and it's in the contract negotiating stage. We still need an engagement contract with the DOE. We are in the first batch of the negotiation and we'll see the results soon*."

116.    In presentation that accompanied the 4Q22 Earnings Call, the Company represented that it was "Selected by U.S. Dept. of Energy for $200M grant for our unique polyaramid separator technology."

117.    The statements detailed above were materially false and misleading when made, and omitted material facts necessary to make the statements not misleading. Specifically, the Company misleadingly concealed that it had made false statements in the Application and, as a result, there was a substantial risk that Microvast would not receive the $200 million grant from the DOE. Microvast's Application to the DOE falsely claimed that it was a U.S. firm with operations in other countries, of which China was only one; that it had manufacturing facilities in

the U.S. and Europe; and that a substantial proportion of its intellectual property was developed outside China. In fact, Microvast's Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and almost 95% of its employees. Investors who had reasonably assumed the Company had been forthright in the Application about the Chinese government's potential influence over it were now also led to believe that the DOE had not only considered such potential influence, but decided to proceed with a grant anyway. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed the serious risks that the Department of Energy would ultimately terminate grant negotiations.

***Materially False and Misleading Statements Concerning the Clarksville Facility***

118.    During the 4Q22 Earnings Call, Defendant Wu responded to an analyst's question concerning the Clarksville Facility's capacity by stating:

> The question is the Clarksville—Clarksville factory will be ready at the end of this year scheduled and we are on the fast speed and those sort of for the construction and then equipment is fabricating in China and—actually ***I went there last week. I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing] and—the factory testing***. After factory testing, it's qualified and we're going to ship I, ship to U.S. and install in U.S. The expectation is going to the end of this year to produce the battery.

119.    Defendant Wu also stated that "[a]fter factory testing, it's qualified and we're going to ship it. Ship to U.S. and install in U.S. The expectation is going to the end of this year to produce the battery." In PowerPoint slides accompanying the presentation, Microvast stated that its "New 2GWh U.S. cell and module facility in Clarksville, TN will be online in Q4 [2023]."

120.    During an earnings call held on May 9, 2023, in response to an analyst's question concerning the Clarksville Facility's equipment procurement, Defendant Wu stated:

> I can answer this question. ***The U.S. facility actually is 100% of mirror with China, the equipment that same supplier, same system, just the different certification***

*that U.S. require a UL certification*. And that's why we slightly, the behind a giant China equipment installation. ***And with the maturity of China site and operation experience and installation experience, we overcome all the problems in China***. And we think the U.S. is going to be much smoother, and also we send the U.S. crew to China for the operation and installation training as well, that's why I expected U.S. is going to be much, much smoother. ***And we're still on the track on the plan to build this factory before the end of this year. That's our plan. It still remain[s].***

121.    On May 25, 2023, Microvast held its Investor Day. In prepared remarks, Defendant

Smith stated, about the Clarksville Facility:

Right now, it's just the ***building with utilities, with the equipment on the way***.

\*        \*        \*

Now in Clarksville, we're making changes to the equipment. It's now put—that we had to do in Huzhou to get that running—***it's now being put on boats. Through June, July, August, September, all the equipment's coming into Clarksville***.

\*        \*        \*

But the confidence is very high because the U.S. team was with me while we [built out the Huzhou expansion]. Those that weren't there are now. We have a team there now, we got another team going in June. They get to see a production line already operating, already programmed, set up, and then they go back home and say, okay, ***as soon as [the equipment] lands, we're ready to do that.***

122.    Also on May 25, 2023, Microvast issued a press release updating investors on its

activities after announcing the termination of negotiations with the DOE. Speaking about the

Clarksville Facility, the press release stated "[t]he facility is ***about half-way through the***

***company's more than $300 million investment in the plant.***"

123.    On June 30, 2023, Microvast issued a press release stating that "Microvast began

construction of its 4GWh cell and module facility in Clarksville in 2021. The Company expects

production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee."

124.    On August 7, 2023, Microvast held a conference call to discuss second quarter 2023

results. In prepared remarks, Defendant Webster stated that "we are pleased to report that our

Clarksville facility *remains on track for a Q4 start of trial production*."

125.    The following day, Microvast delivered a presentation at the Oppenheimer Technology, Internet & Communications Conference. During the call, Defendant Webster stated that, with respect to the Clarksville Facility, "*the construction phase is nearly done*. The equipment we've been paying installments for, *the equipment's arriving now*." Also on the call, in response to a question concerning U.S. manufacturing and targeted timeframes, Defendant Wu stated:

> *We are ready right now*. We are running super, super fast. *The entire team is just racing to get there.* And they put their 2 GWh in Clarksville, Tennessee. *And we expect the test production at the end of this year* and as in slowly ramping up to the capacity—design capacity.

126.    On November 9, 2023, during an earnings call to discuss the Company's results from the third quarter 2023, Defendant Ward stated:

> *On the construction side, we are nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter*. We're also in good position with our production equipment, where we're using the same equipment that is now running with great success on our Huzhou 3.1 line. *We have approximately 30% of the equipment on site in Clarksville with majority of the remaining equipment having already been shipped.*

127.    On December 13, 2023, Microvast participated in a Fireside Chat with Cantor Fitzgerald. Defendant Wu dialed in from the Clarksville Facility. The Company stated that Microvast had achieved its goals for 2023, including construction of the Clarksville Facility, with Defendant Webster adding that "*we've really achieved [our goals] for this year*. . . . And then we've really moved along great strides on Clarksville. *Construction——pretty much done*. We still do commissioning and installation from here on in, *and when that's all done it's what we set out to do*. . . ." Defendant Webster further added that the Company was "in the race to get Clarksville into production[,]" in order to earn Inflation Reduction Act subsidies.

128.    The statements detailed above were materially false and misleading when made, and omitted material facts necessary to make the statements not misleading. Specifically the statements failed to reveal that: (i) the facility's key supplier, Lyric Robot Automation Co., Ltd., ("Lyric"), experienced substantial setbacks, had not assembled, let alone factory tested, a substantial majority of the equipment, and, as a result, repeatedly missed key deadlines; (ii) assurances that the timeline was on track and that the "expectation is going to the end of this year to produce the battery[,]" were unreasonable given the substantial delays and setbacks; (iii) the Clarksville Facility could not have been "half-way" through its $300 million capital expenditure budget in May 2023 because, as Microvast would later admit, the facility was only halfway through its investment by April 2024; (iv) by late June 2023, construction of the Clarksville Facility was far behind schedule, with no cleanroom and electricity only for select functions, among other defects; and (v) contractors had begun to walk off the job at the Clarksville Facility construction site because Microvast was not paying its bills.

***Materially False and Misleading Proxy Statement Issued During the Relevant Period***

129.    On August 18, 2023, Microvast filed a proxy statement on Form DEF 14A with the SEC (the "2023 Proxy Statement"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Wong and Whittingham to the Board and the ratification of the appointment of Deloitte Touche Tohmatsu Certified Public Accountants LLP ("Deloitte") as the Company's independent registered public accounting firm.

130.    The 2023 Proxy Statement represented that the Audit Committee is responsible for "discussing with management major risk assessment and risk management policies"; "inquiring and discussing with management our compliance with applicable laws and regulations"; and "establishing procedures for the receipt, retention and treatment of complaints received by us

regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies."

131.    With respect to the Company's risk management function, the 2023 Proxy Statement represented:

> Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management strategy and the most significant risks facing us and oversees the implementation of risk mitigation strategies by management. Our Audit Committee is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

> Our Compensation Committee is principally responsible for establishing, overseeing and administering our compensation plans and policies for our executive officers, including our equity incentive plans. Our Compensation Committee is also responsible for overseeing risks related to our compensation programs and practices. Our Compensation Committee has assessed the risk associated with our compensation policies and practices for our employees and determined that the risks associated with such policies and practices are not reasonably likely to have a material adverse effect on us. Our Compensation Committee utilizes compensation practices that it believes discourage our employees from excessive risk-taking that could be reasonably likely to have a materially adverse effect on us.

132.    The statements identified above, issued in the 2023 Proxy Statement, were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) progress at the Clarksville Facility was severely behind schedule after construction delays, equipment procurement failures, and a work stoppage; and (ii) despite descriptions of the Board's and its committees oversight functions with respect to internal controls, risk management, and the Company's compliance with applicable laws and regulations, the Board and its committees failed to adequately exercise these functions and permitted and/or caused the Company to issue the materially false and misleading statements detailed herein.

*The Truth Emerges*

133.    On December 7, 2022, Ranking Member of the Senate Committee on Energy and Natural Resources John Barrasso ("Barrasso") publicly released a letter he was sending to DOE Secretary Jennifer Granholm ("Granholm") raising "grave concerns" about the $200 million grant to Microvast. Barrasso asked Granholm to explain why the DOE had issued the grant to a "company joined at the hip with China." Barrasso's letter cited the Company's own SEC filings admitting that Microvast is "subject to extensive PRC government regulation[.]" House Science, Space, and Technology Committee member Frank Lucas also publicly released a letter to Granholm that day, raising many of the same concerns as Barrasso.

134.    On May 22, 2023, the truth with respect to the Company's DOE Application emerged when Bloomberg reported that the DOE was discontinuing negotiations over the $200 million grant.

135.    On this news, the price of Microvast stock declined 45.2%, from a price of $2.20 per share on May 22, 2023 to a price of $1.40 per share on May 23, 2023.

136.    On June 21, 2023, at a hearing before the House Oversight and Investigations Subcommittee, the DOE's David Howell testified in response to a question about the termination of negotiations with Microvast:

> Q: So what kinds of concerns would keep DOE from actually providing a company an award? Maybe you've answered that, but if you . . .
>
> Howell: Sure. So ownership by a federal entity of concern, as defined in the regulations and in appropriation, ***the control that a Federal entity of concerned could actually exhibit over a U.S. company***, that control could be shares in the company. It could the parent company ownership as well. And it could also be, as I mentioned, voting members on the board. It could be key personnel being part of the talent's program. ***It could be an IP position***.

137.    On April 1, 2024, the Company hosted an earnings call to discuss its fourth quarter 2023 financial results.

138.    During the call, the Company revealed that it had stopped construction of the Clarksville Facility until it could secure financing. Specifically, during the call, Defendant Wu stated that "we are not currently anticipating material production volumes or revenues from our Clarksville facility. . . . Once we are able to secure financing, our current estimate is that an additional six months to eight months is needed to bring Clarksville Phase 1A to SOP, with the majority of this time allocated to equipment."

139.    Later during the call, in response to a question regarding "the overall quantum of capital that [Microvast would] need to secure to get Clarksville back on track," Defendant Webster stated:

> So as we indicated last time, we've got about halfway through Clarksville on CapEx. So to get it done, it's about $150 million. That includes some aging AP and the so the majority of what's best to spend, relates to equipment and installation. And to do that, we need to raise money. As we've always said, we've got this as far as we could on balance sheet. So we've been working for quite a period now and you're probably sick of hearing us talk about it on the financing and it wasn't done at the end of the year we're still making progress on that. No guarantees that it's done, but we've been spending a lot of time with one lender in particular.
>
> The estimated timing to get Clarksville to SOP would be six months to eight months from when we close that financing. And as I just mentioned, the majority of that time is to do installation. We'd already started some installation during Q4.

140.    On this news, the price of Microvast stock declined 34.1%, from a close of $0.90 per share on April 1, 2024 to a close of $0.59 per share on April 2, 2024.

***The Securities Class Action***

141.    As a result of the misconduct detailed herein, the Securities Class Action was filed against the Company, along with Defendants Wu and Webster. The plaintiffs in the Securities Class Action filed the Amended Complaint on May 13, 2024, naming Defendants Kelterborn, Smith and Ward as defendants in addition to Microvast and Defendants Wu and Webster. ECF No. 30. On June 27, 2024, the defendants in the Securities Class Action filed a motion to dismiss

the Amended Complaint (the "MTD"). ECF No. 37.

142.    On August 22, 2025, the Court in the Securities Class Action entered an order, granting in part and denying in part the MTD (the "MTD Order"). ECF No. 50. In the MTD Order, the Court held that, "by overstating the status of the $200 million funding to their investors, Defendants arguably misled them." MTD Order, ECF No. 50, at 19. The Court further upheld allegations of scienter with respect to the misleading statements concerning the DOE Application:

> Given the crucial nature and substantial sum of the funding, far from the information being fed from below, it was much more likely that the executive management had a direct hand in the process and was apprised of any developments, including that negotiations and vetting were pending.

*Id.* at 26.

143.    With respect to statements concerning the Clarksville Facility, the Court held that "all of the Clarksville Statements outlined [in the Amended Complaint] were false or misleading when made" and that the allegations in the Amended Complaint "g[ave] rise to a strong inference that Wu was, at least severely reckless in making statements regarding the facility progress." *Id.,* at 36, 43. The Court additionally held that Defendant Smith "either did verify and still misstated the progress or he failed to verify the statements- as a reasonable person responsible for the project would have- which would have been severely reckless." *Id.* at 44.

144.    The Securities Class Action has harmed the Company by causing Microvast to incur substantial legal fees defending itself and by exposing the Company to millions of dollars in potential class-wide damages.

### *Harm to the Company*

145.    As a direct and proximate result of the Individual Defendants' misconduct, Microvast has lost and expended, and will lose and expend, millions of dollars.

146.     Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Kelterborn, Smith, Ward, Wu, and Webster, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

147.     Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

148.     Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

149.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

150.     Microvast is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

151.     Plaintiffs are current shareholders of Microvast and were continuous shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

152.     At the time this action was commenced, the five-member Board was comprised of Defendants Wu, Ying, and Wong, along with Shing Pan and Isida Tushe, who joined the Board after the Relevant Period and are not parties to this Action.

153.     The Individual Defendants ether knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith

effort to prevent or remedy that situation.

154.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

155.    Additionally, the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

156.    Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

157.    Nevertheless, by letter dated September 23, 2024, Plaintiffs made a demand on the Board to investigate and remedy the violations of law described therein (the "Litigation Demand"). *See* Exhibit A.

158.    In the Litigation Demand, Plaintiffs demanded as follows:

Stockholders demand that the Board investigate the circumstances surrounding the Company's false and misleading statements and violations of all applicable laws, rules, and regulations. The Board must undertake an investigation of the wrongdoing detailed herein and in the Complaint by independent and disinterested directors with the assistance of independent outside legal counsel. The investigation should be sufficient to determine:

(a)    which current or former Microvast employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's failure to comply with applicable laws;

(b)    which current or former Microvast employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's false and misleading statements;

(c)  which current or former Microvast employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in oversight of all of the forgoing;

(d)  the extent to which the current or former Microvast employees, officers, directors, and/or agents benefited as a result of the breaches of fiduciary duty owed to the Company and its stockholders; and

(e)  the extent to which Microvast was damaged by all of the foregoing.

Following the investigation, Stockholders demand that Microvast commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above and in the Complaint. The legal proceedings should bring claims for breaches of fiduciary duty, among other relevant and appropriate claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. The Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. To the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Microvast from committing future wrongful and wasteful acts. Moreover, any future resolutions to the Company's Articles of Incorporation or Bylaws should be put to a stockholder vote, and the following actions may be necessary to ensure proper corporate governance policies, among others:

(a)  a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

(b)  a proposal to strengthen the Company's disclosure controls; and

(c)  a provision to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

159.  The Litigation Demand outlined alleged misstatements issued by the Individual Defendants related to the DOE Application and the Clarksville Facility.

160.    On December 6, 2024, counsel for Microvast sent a letter in response to the Litigation Demand, stating, that "[y]our letter has been forwarded to the attention of the members of the Board for their review and consideration" and that counsel "will provide a further update at an appropriate time." *See* Exhibit B.

161.    Plaintiffs have received no further communications from Microvast regarding the Litigation Demand.

162.    The Securities Class Action has since progressed, and on August 22, 2025, the Court entered the MTD Order, denying in part the MTD the Securities Class Action by the defendants in that case.

163.    The Board's failure to follow up with the investigation into the allegations detailed in the Litigation Demand for a full year constitutes a wrongful refusal of the Litigation Demand, is unreasonable and improper, and demonstrates the Board's lack of good faith.

164.    Accordingly, refusal of the Litigation Demand is not a valid exercise of business judgment, and, therefore, Plaintiffs are permitted to proceed and to prosecute this action derivatively on behalf of the Company.

### COUNT I
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

165.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

166.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

167.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

168.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

169.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy Statement, which was filed with the SEC. As alleged above, the 2023 Proxy Statement contained materially false and misleading statements concerning the Clarksville Facility and the Company's risk management function, its internal controls, and its legal compliance.

170.    The 2023 Proxy Statement was used to solicit shareholder votes in connection with the re-election of Defendants Wong and Whittingham to the Board and the ratification of the appointment of Deloitte as the Company's independent registered public accounting firm. The false and misleading statements contained in the 2023 Proxy Statement were material to Plaintiffs in voting for such matters.

171.    The false and misleading statements in the 2023 Proxy Statement concerning the Clarksville Facility and the Company's risk management function, its internal controls, and its legal compliance therefore misleadingly induced Plaintiffs and other shareholders to vote in favor of the appointment of Deloitte as the Company's independent registered public accounting firm

and the election of Defendants Wong and Whittingham to the Board, which allowed these directors to continue breaching their fiduciary duties to the Company during the Relevant Period.

172.    Plaintiffs, on behalf of Microvast, have no adequate remedy at law.

**COUNT II**
**Against Defendants Wu, Webster, Kelterborn, Smith, and Ward for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

173.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174.    Microvast, along with Defendants Wu, Webster, Kelterborn, Smith, and Ward (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

175.    The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Microvast securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

176.    If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

177.    The Officer Defendants, because of their positions of control and authority as senior

executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

178.    Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

179.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

**COUNT III**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

180.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

182.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

183.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company maintained extensive ties to China and to the Chinese government; (ii) a substantial amount of the Company's operations were conducted in China; (iii) the vast majority of the Company's employees were located in China; (iv) a substantial amount of the Company's intellectual property was developed in China; (v) as a result, there was a substantial risk that Microvast would not receive the $200 million grant from the DOE; (vi) construction of the Clarksville Facility was significantly delayed due to mismanagement, equipment procurement failures, and a work stoppage; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

185. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

186. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and

omissions of material fact referenced herein.

187.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

188.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

189.    Plaintiffs, on behalf of Microvast, have no adequate remedy at law.

### COUNT IV
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

190.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

192.    Plaintiffs, on behalf of Microvast, have no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Unjust Enrichment

193.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

194.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microvast.

195.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Microvast that was tied to the performance or artificially inflated valuation of Microvast, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

196.    Plaintiffs, as shareholders and representatives of Microvast, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

197.    Plaintiffs, on behalf of Microvast, have no adequate remedy at law.

## COUNT VI
### Against the Individual Defendants for Waste of Corporate Assets

198.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

199.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

200.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and

(ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

201.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

202.    Plaintiffs, on behalf of Microvast, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Microvast to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Microvast and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the

policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims set forth herein.

DATED: November 19, 2025                    **RIGRODSKY LAW, P.A.**

By:    */s/ Samir Aougab*
      Samir Aougab
      #3930200
      1007 North Orange Street, Suite 453
      Wilmington, DE 19801
      Telephone: (302) 295-5310
      Facsimile: (302) 654-7530
      Email: sa@rl-legal.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: tjm@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com